STATE OF NORTH CAROLINA v. DAMIEN LANEL GABRIEL

No. COA09-1669

(Filed 19 October 2010)

**1. Criminal Law— jury instructions—acting in concert—first-degree murder—assault with deadly weapon with intent to kill inflicting serious injury**

The trial court did not err in a first-degree murder and assault with a deadly weapon with intent to kill inflicting serious injury case by instructing the jury on acting in concert. It was undisputed that defendant was present at the scene and there was sufficient evidence that defendant and another individual were shooting at the victims pursuant to a common plan or purpose.

STATE v. GABRIEL

[207 N.C. App. 440 (2010)]

**2. Evidence— extrinsic evidence—impeachment—not improper**

The trial court did not err by admitting into evidence the transcript of a witness's out-of-court statements to the police to impeach his testimony. The witness's statements were material and his testimony was inconsistent in part with his prior statements.

**3. Evidence— transcript of out-of-court statements—impeachment—not as subterfuge for inadmissible hearsay**

The trial court did not err by admitting into evidence the transcript of a witness's out-of-court statements to the police to impeach his testimony. The circumstances indicated that the State called the witness to testify in good faith and not as a subterfuge to put his otherwise inadmissible hearsay before the jury.

**4. Evidence— impeachment—probative value not outweighed by prejudicial effect**

The trial court did not err by admitting into evidence the transcript of a witness's out-of-court statements to the police to impeach his testimony. The probative value of the transcripts was not substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or misleading the jury.

Appeal by Defendant from judgments entered 9 April 2009 by Judge Jesse B. Caldwell, III in Mecklenburg County Superior Court. Heard in the Court of Appeals 18 August 2010.

*Attorney General Roy Cooper, by Special Deputy Attorney General H. Dean Bowman, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Constance E. Widenhouse, for Defendant.*

STEPHENS, Judge.

*Facts*

On 28 August 2006, Defendant Damien Lanel Gabriel was indicted in Mecklenburg County, North Carolina on one count of first-degree murder and one count of assault with a deadly weapon with intent to kill inflicting serious injury. Defendant pled not guilty to the charges and was tried by a jury in Mecklenburg County Superior Court.

The evidence presented at trial tended to show the following: On the evening of 3 August 2006, murder victim Jerome Tallington and assault victim Kenneth Lackey were at the home of Tallington's

fiancée Tara McGhee. McGhee's home was across the street from the residence of Dennis Brown. That evening, Brown was at his home with his mother and Shaun Ryan, the brother of Brown's girlfriend.

Shortly after Lackey and Tallington arrived at McGhee's home, Defendant pulled up to Brown's house in a gray station wagon and exited the vehicle holding a long gun, described by witnesses as having a banana-shaped bullet pouch and being similar in size and shape to an AK-47. Defendant entered Brown's house and re-emerged shortly thereafter. Witnesses testified that after an exchange of words in the street between the victims and Defendant, several gun shots were fired.

Following the shooting, Defendant was seen entering Brown's home. When police officers arrived at the scene, Defendant's gray station wagon was still parked in front of Brown's house, Lackey was on McGhee's porch, and Tallington, who had been shot twice, was lying dead at the end of Brown's driveway. The SWAT team was called in, the neighborhood was locked down, and a stand-off between law enforcement officers and the occupants of Brown's house ensued for several hours until, at last, Brown and his mother came out of Brown's house. During their investigation of the crime scene, police found several spent bullet cartridges near the end of Brown's driveway. Bullet holes were found in McGhee's truck, as well as in other vehicles parked in front of McGhee's house, and in McGhee's porch posts and in the house next door to McGhee.

The evidence showed that along the back edge of Brown's backyard was a fence that separated Brown's backyard and a wooded area, and beyond the wooded area was a shopping center. A gate in the fence opened to a path through the wooded area and came out at the back of the shopping center. An officer who was positioned behind the shopping center on the night of the shooting testified that a black male, whom she later identified as Defendant, walked by her car that night.

On 4 August 2006, the day after the shooting, officers found a weapon resembling an AK-47 in the woods behind Brown's house. The shell casings and a bullet from the scene of the shooting were matched to the gun found in the woods. Another shell casing was found near the side of Brown's house, but this casing did not match the gun from the woods.

On the afternoon of August 4, Defendant turned himself in to the Charlotte-Mecklenburg Police Department. While in police custody,

STATE v. GABRIEL

[207 N.C. App. 440 (2010)]

Defendant made several phone calls to Brown, in which Defendant asked Brown to look for the "chopper." Testimony at trial revealed that "chopper" is a slang term that often refers to a semiautomatic rifle.

While imprisoned, Defendant also called his father Effrod Young. According to Young's testimony, Defendant told Young, "I was just taking [the gun] to give it to him. I got caught in the middle. When I got out of the car, they ran up on me and started talking." Young also testified that he spoke with Ryan, who admitted to Young that he was in Brown's backyard when he heard a gunshot that came from in front of the house. According to Young's testimony, Ryan stated that he then ran around to the front of Brown's house, ducked behind a car, and "emptied" his ammunition clip while firing at a "guy." Ryan testified, however, that although he did not recall any specific events from 3 August 2006, he knew he did not shoot anyone.

Following the presentation of the evidence, the trial court instructed the jury on possible verdicts of murder and assault with a deadly weapon. The court further instructed that the jury could find Defendant guilty of any of the crimes if they found that the Defendant, "or someone with whom he acted in concert," committed the crime.

On 8 April 2009, the jury returned verdicts finding Defendant guilty of first-degree murder and assault with a deadly weapon with the intent to kill. On 9 April 2009, Defendant was sentenced to life imprisonment without parole for the murder charge and to 46 to 65 months imprisonment for the assault charge. Defendant appeals.

### Discussion

### I. Improper instruction of the jury on acting in concert

[1] On appeal, Defendant first argues that the trial court's jury instruction on acting in concert was error because that theory of guilt was not supported by the evidence. We disagree.

Assignments of error challenging the trial court's jury instructions are reviewed de novo by this Court. State v. Osorio, 196 N.C. App. 458, 466, 675 S.E.2d 144, 149 (2009). Our Supreme Court has held that it is error for the trial judge "to permit a jury to convict upon some abstract theory not supported by the evidence[.]" State v. Dammons, 293 N.C. 263, 272, 237 S.E.2d 834, 840 (1977).

In order to support a jury instruction on acting in concert, the evidence must be sufficient to show that the defendant was present at the

scene of the crime and that the defendant was acting together with another who did the acts necessary to constitute the crime pursuant to a common plan or purpose to commit the crime. *See State v. Joyner*, 297 N.C. 349, 357, 255 S.E.2d 390, 395 (1979). Whether there was sufficient evidence to support the trial court's instruction on acting in concert must be determined based on the varying facts of each case. *State v. Dickens*, 346 N.C. 26, 39, 484 S.E.2d 553, 560 (1997); *State v. Jefferies*, 333 N.C. 501, 512, 428 S.E.2d 150, 156 (1993); *Joyner*, 297 N.C. at 358, 255 S.E.2d at 396.

Defendant argues that the evidence tended to support only two theories: (1) that Defendant committed all of the acts constituting the crimes of felonious assault and murder, or (2) that Ryan committed all, and Defendant committed none, of the acts constituting the alleged crimes. Defendant contends that neither of these views of the evidence supported an instruction on concerted action.

Defendant argues that the first theory of the evidence did not support an instruction on acting in concert because it tended to show that Defendant acted alone, and not "together with another." We agree that under this view of the evidence, an instruction on acting in concert would be erroneous. It is well settled in North Carolina that the doctrine of acting in concert requires the action of two or more people. *See, e.g., State v. Wilkerson*, 363 N.C. 382, 424, 683 S.E.2d 174, 200 (2009), *cert. denied*, —— U.S. ——, 176 L. Ed. 2d 734 (2010); *State v. Thomas*, 325 N.C. 583, 595, 386 S.E.2d 555, 561 (1989).

As for Defendant's second theory, Defendant argues there was a lack of evidentiary support for a common plan or shared purpose between Ryan and Defendant such that this second view of the evidence did not support a jury instruction on acting in concert. We disagree with Defendant's theory in this respect.

Defendant cites *State v. Forney*, 310 N.C. 126, 310 S.E.2d 20 (1984), in support of his argument. In *Forney*, our Supreme Court found that although the evidence showed that the defendant was present during, and aware of, a sexual assault committed by others, the defendant's statement that he was " 'thrown' on the victim but 'didn't do nothin[g]' " tended to be "exculpatory with respect to his willingness to participate in or even his knowledge or acquiescence in consummating this offense." *Id.* at 134, 310 S.E.2d at 25. The Court reversed the defendant's conviction because the evidence was insufficient to permit a reasonable inference that the defendant and the others were acting together in pursuance of a common plan to commit sexual assault. *Id.*

In this case, as in *Forney*, Defendant's statement that he was just taking the gun to Brown's house when he "got caught in the middle" tended to be "exculpatory with respect to his willingness to participate" in the shooting. However, unlike in *Forney*, there was other evidence to support a reasonable inference that Defendant and Ryan acted together pursuant to a common plan or purpose.

The evidence in support of Defendant's theory tended to show that Ryan came around the house after hearing a gunshot and fired repeatedly at, and consistently hit, a person in the front yard. Assuming its truth, this evidence did not contradict any of the other evidence tending to show that Ryan was at Brown's house on the day of the shooting; that when Defendant arrived he went inside Brown's house with the weapon; that Defendant claimed to have brought the gun for someone else; and that, at the time of the shooting, Defendant was in front of Brown's house with a weapon and was firing in the direction of the victims in the street. We conclude that this evidence did permit a reasonable inference that Defendant and Ryan were shooting at the victims pursuant to a shared or common purpose.

Accordingly, the reasonable inference of a common plan or purpose, along with Defendant's undisputed presence at the scene, was sufficient to support the court's instruction on acting in concert. Therefore, we hold that the trial court did not err by instructing the jury on acting in concert.

## II. *Improper admission of Dennis Brown's out-of-court statements*

[2] Defendant next argues that the trial court erred by admitting into evidence Dennis Brown's out-of-court statements to the police. We review *de novo* a trial court's determination of whether an out-of-court statement is admissible. *See, e.g., State v. Minter*, 111 N.C. App. 40, 432 S.E.2d 146 (reviewing *de novo* a trial court's decision to allow extrinsic evidence of a witness's hearsay statements), *disc. rev. denied*, 335 N.C. 241, 439 S.E.2d 158 (1993).

At trial, the State called Brown to testify regarding the events leading up to, and immediately following, the shooting. Brown testified that he did not call Defendant on the day of the shooting and ask Defendant to bring a gun to Brown's house and also that he did not recall whether he saw Defendant enter Brown's house with a weapon immediately after the shooting. Because this testimony was inconsistent with Brown's prior statements to police, the State moved the court to allow the State to treat Brown as a hostile witness. After the court granted the motion

over Defendant's objection, the State extensively cross-examined Brown on his prior statements. Brown denied telling police officers that he called Defendant to bring a gun and denied telling officers that he saw Defendant with a gun following the shooting.

The State later attempted to introduce a redacted version of a transcript of Brown's prior statements. Over Defendant's objection, the trial court ruled the statements admissible for the purpose of impeaching Brown's credibility. The portion of the transcript at issue in this appeal is excerpted below:[1]

> P    Alright. Um, earlier we were talking about you said that Sean . . '. or I mean that [Defendant] had something in his hand. What did you notice that [Defendant] had in his hand?
>
> B    Something long[] . . . .
>
> P    Okay.
>
> B    . . . like a rifle or something.
>
> P    Alright. So you saw him with a gun?
>
> B    Yes.
>
>      . . . .
>
> P    Okay, but you saw [Defendant] with the gun.
>
> B    Yes.
>
>      . . . .
>
> H    Uh huh. Well, this shooting happened at 10:46.
>
> B    I don't know, maybe fifteen minutes before he got there . . . cause he called me like bring a gun if your [sic] coming back.
>
> H    So he called you or you called him?
>
> B    I called him.

On appeal, Defendant asserts three separate grounds to support his argument that admission of these statements was error. Because each argument proceeds on a different theory, we address each separately.

*A. Improper use of extrinsic evidence for impeachment*

Defendant first argues that the admission of the transcript of the statements for the purpose of impeachment by prior inconsistent state-

---

1. In the excerpt, P and H are police officers and B is Brown.

ments was error because it was introduced to impeach Brown on the collateral matter of whether Brown did or did not make the statements.

In support of this argument, Defendant cites *State v. Hunt,* 324 N.C. 343, 378 S.E.2d 754 (1989). In *Hunt,* our Supreme Court applied the longstanding rule against using extrinsic evidence to impeach a witness on collateral matters, to prohibit the introduction of the substance of a prior statement to impeach a witness's *denial* that he made that prior statement because the truth or falsity of that denial was a collateral matter. *Id.* at 348-49, 378 S.E.2d at 757.

However, this Court has since held that in cases where the witness not only denies making the prior statements *but also testifies inconsistently* with the prior statements, *Hunt* does not prohibit impeaching a witness's *inconsistent* testimony with the substance of the prior statements. *See State v. Wilson,* 135 N.C. App. 504, 507, 521 S.E.2d 263, 264-65 (1999); *Minter,* 111 N.C. App. at 48-49, 432 S.E.2d at 151. In this case, the substance of Brown's prior statements was admitted to impeach Brown's inconsistent testimony, and not Brown's denial. Therefore, the holding in *Hunt* does not require exclusion of the prior statements here.

Regardless, Defendant further argues that because Brown denied making the relevant statements, "the [S]tate could impeach Brown regarding whether he made the entire statement, but it could not properly introduce extrinsic evidence of the substance of those statements." We are unpersuaded by Defendant's argument.

It has long been the law in North Carolina that where a witness's prior inconsistent statements are material, those statements may be proved by extrinsic evidence without first calling the prior statements to the attention of the witness on cross-examination. *See, e.g., State v. Green,* 296 N.C. 183, 192-93, 250 S.E.2d 197, 203 (1978) (cited in *Hunt,* 324 N.C. at 348, 378 S.E.2d at 757).

Under this rule, impeaching counsel need not give the witness an opportunity to admit or deny making the prior inconsistent statements before presenting extrinsic evidence of those statements. *Id.* Therefore, Brown's denial is irrelevant to the determination of whether extrinsic evidence could have been presented. Rather, all that was necessary was that the witness testified inconsistently and that the subject matter of the prior statements was material. *See State v. Whitley,* 311 N.C. 656, 663, 319 S.E.2d 584, 589 (1984) (holding that because a witness's prior statement was inconsistent with her testimony in part, and because the

prior statement was material, the trial court did not err in allowing the State to prove the witness's prior inconsistent statements with extrinsic evidence).

In this case, there can be no doubt that Brown's statement that he called Defendant to bring a gun and Brown's two statements that he saw Defendant with a gun were material in that these statements related to the events leading up to, and immediately following, the shooting in front of Brown's house. *See id.* (holding that the witness's prior statement was "material in that it related to events immediately leading to [the crime committed]"). Further, Brown's testimony was inconsistent in part with the prior statements. Accordingly, extrinsic evidence of Brown's prior statements was permissible to impeach Brown's testimony. *Id.* Defendant's argument is overruled.

### B. Violation of Rule 607

[3] Defendant next argues that the admission of Brown's out-of-court statements for the purpose of impeachment was error on the ground that "the prosecutor used the guise of impeaching its own witness as a subterfuge for putting otherwise inadmissible hearsay before the jury when the record failed to show the prosecutor was surprised by Brown's in-court testimony[.]" Specifically, Defendant argues that while North Carolina Rule of Evidence 607 allows any party to attack the credibility of a witness, the use of Rule 607 to mask impermissible hearsay as impeachment is improper because of the likelihood a jury will consider the statements as substantive evidence rather than as impeachment evidence. *See* N.C. Gen. Stat. § 8C-1, Rule 607 (2009).

Defendant again cites *Hunt* in support of his argument. In *Hunt*, our Supreme Court recognized "the difficulty with which a jury distinguishes between impeachment and substantive evidence and the danger of confusion that results[.]" *Hunt*, 324 N.C. at 349, 378 S.E.2d at 757. Accordingly, our Supreme Court acknowledged that the "overwhelming weight of federal authority with regard to the use of the identical Fed. R. Evid. 607 has long been that impeachment by prior inconsistent statement may not be permitted where employed as a *mere subterfuge* to get before the jury evidence not otherwise admissible." *Id.* (internal quotation marks and brackets omitted; emphasis in original).

The Court in *Hunt* further noted that

[i]t is the rare case in which a federal court has found that the introduction of hearsay statements by the state to impeach its own witness was not motivated primarily (or solely) by a desire

to put the substance of that statement before the jury. Circumstances indicating good faith and the absence of subterfuge in these exceptional cases have included the facts that the witness's testimony was extensive and vital to the government's case; that the party calling the witness was genuinely surprised by his reversal; or that the trial court followed the introduction of the statement with an effective limiting instruction.

*Id.* at 350, 378 S.E.2d at 758 (citations omitted).

Our Supreme Court went on to apply these indicia of "good faith and the absence of subterfuge" to the facts in *Hunt* and ultimately found that the "circumstances accompanying the introduction of [the witness's] prior unsworn statement provide no assurance either that [the witness's] testimony was critical to the state's case or that it was introduced altogether in good faith and followed by effective limiting instructions." *Id.* at 351, 378 S.E.2d at 758-59.

In this case, Defendant argues that none of the circumstances indicating good faith were present with respect to the impeachment of Brown, such that the impeachment by prior inconsistent statements was impermissible. We disagree.

The most notable difference between this case and *Hunt* is the presence of an effective limiting instruction. In *Hunt*,

[while] the trial court initially indicated that the jury was to consider [the witness's] prior unsworn statements for the limited purpose of later determining the officer's credibility, the court failed to include a subsequent similar warning either when the statements were read to and denied by [the witness] or when they were reiterated during the direct examination of the officer. Instructions regarding the statements during the final charge were no less ambiguous.

Moreover, by the time the statements were actually introduced as exhibits, they were before the jury as substantive evidence, and all earlier apparent efforts to restrict their use to impeachment of [the witness] or corroboration of the officer's testimony were mooted by their substantive use.

*Id.* at 351-52, 378 S.E.2d at 759.

In this case, however, the introduction of Brown's prior statements was preceded by a limiting instruction explaining to the jury that "the Court is allowing these exhibits to be admitted for one pur-

pose and for one purpose alone, and that purpose is what is known as impeachment of certain testimony of the witness, Dennis Brown." These instructions are sufficient for the jury to distinguish this evidence as impeachment evidence, rather than substantive evidence.

Further, unlike in *Hunt* where the witness's testimony "consisted entirely of responding to challenges to her credibility[,]" in this case Brown's testimony was valuable to the State's case in that it described Brown's home and backyard in relation to the path through the woods leading to the shopping center where Defendant was spotted after the shooting, it laid the foundation for admission of Defendant's telephone calls from prison to Brown, and it corroborated other eyewitness testimony. *Id.* at 351, 378 S.E.2d at 758.

Finally, the facts of this case do not indicate, as the facts in *Hunt* did, that "the state appeared to know before [the witness] was called to the stand that she would not cooperate by reiterating her prior statements." *Id.* In this case, while Brown's "lack of cooperation with the State and his failure to appear voluntarily until []after being served with a show-cause order" certainly tend to show that Brown was reluctant to testify at Defendant's trial, there is nothing to indicate that the State knew Brown would refuse to testify to, or would testify inconsistently with, the matters contained in Brown's prior statement.

Based on the foregoing, we conclude that the circumstances in this case indicate that the State called Brown to testify in good faith and not as a subterfuge to put Brown's out-of-court statements before the jury "in the hope that the jury would miss the subtle distinction between impeachment and substantive evidence[.]" *Id.* at 349-50, 378 S.E.2d at 758 (quoting *United States v. Webster*, 734 F.2d 1191, 1192 (7th Cir. 1984)). Defendant's argument is overruled.

### C. *Violation of Rule 403*

[4] Finally, Defendant argues that the redacted transcript of Brown's out-of-court statements should have been excluded under Rule 403 because any probative value of the statements was substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and misleading the jury. The State contends, however, that because Defendant failed to object to the introduction of Brown's prior statements at trial based on Rule 403, our review is limited to plain error.

Based on this Court's review of the record, Defendant objected to the introduction of Brown's prior statements solely on the bases of

improper use of extrinsic evidence and improper introduction of hearsay statements under the guise of impeachment.

As discussed *supra*, Defendant's objection based on the State's alleged improper introduction of the statements under the guise of impeachment implicates North Carolina Rule of Evidence 607, which provides that "[t]he credibility of a witness may be attacked by any party, including the party calling him." N.C. Gen. Stat. § 8C-1, Rule 607. This Court has noted that Rule 607 "too easily camouflages a ruse whereby a party may call an unfriendly witness *solely* to justify the subsequent call of a second witness to testify about a prior inconsistent statement." *State v. Bell*, 87 N.C. App. 626, 633, 362 S.E.2d 288, 292 (1987) (emphasis in original). Because of the real danger that Rule 607 "would make fair game of almost any out-of-court statement ever made by any witness[,]" *id.*, including those statements that do not actually impeach the witness but only tend to confuse the jury or unfairly prejudice the defendant, our Courts have grafted onto Rule 607 the requirement that the "impeachment should only be allowed when '[c]ircumstances indicating good faith and the absence of subterfuge' are present." *State v. Lanier*, 165 N.C. App. 337, 352, 598 S.E.2d 596, 606 (quoting *Hunt*, 324 N.C. at 350, 378 S.E.2d at 758) (brackets in original), *disc. rev. denied*, 359 N.C. 195, 608 S.E.2d 59 (2004). Further, this Court has noted that the Commentary to Rule 607 "cautions that '[t]he impeaching proof must be *relevant* within the meaning of Rule 401 and Rule 403 and *must in fact be impeaching.*' " *Bell*, 87 N.C. App. at 633, 362 S.E.2d at 292 (quoting N.C. Gen. Stat. § 8C-1, Rule 607 (Commentary)) (brackets and emphasis in original).

Accordingly, where a party seeks to impeach its own witness under Rule 607, that impeachment must not be a subterfuge to get hearsay statements in front of the jury and must be relevant within the meaning of Rule 403. *Lanier*, 165 N.C. App. at 352, 598 S.E.2d at 606; *Bell*, 87 N.C. App. at 633, 362 S.E.2d at 292. Therefore, we hold that Defendant's Rule 607 objection to the introduction of Brown's hearsay statements "under the guise of impeachment" sufficiently implicated the application of Rule 403.

As for the substance of Defendant's objection, Defendant argues that the prejudicial effect of the statements far outweighed the State's need to attack Brown's credibility, such that the evidence should have been excluded. We disagree.

The State introduced the hearsay statements to impeach Brown's inconsistent testimony regarding the material matters of whether

STATE v. GABRIEL

[207 N.C. App. 440 (2010)]

Brown saw Defendant with a gun and whether Brown called Defendant and asked Defendant to bring a weapon to Brown's house. Our Supreme Court has held that evidence tending to impeach material testimony has probative value. *State v. Younger*, 306 N.C. 692, 697, 295 S.E.2d 453, 456 (1982) (holding that a witness's "prior statement . . ., which was inconsistent with her testimony at [trial], has a strong probative value, especially since it relates directly to her account of the incident and those events leading up to it").

Defendant argues further that the hearsay statements were obviously prejudicial because they "significantly strengthened the [S]tate's proof that [Defendant] was the actual shooter or acted in concert with someone who was." Defendant's argument misapprehends the meaning of Rule 403. Evidence is not excluded under the Rule simply because it is probative of the offering party's case and is prejudicial to the opposing party's case. Rather, the evidence must be *unfairly* prejudicial. *See* N.C. Gen. Stat. § 8C-1, Rule 403 (2009); *see also State v. Mercer*, 317 N.C. 87, 95, 343 S.E.2d 885, 890 (1986) (stating that "highly probative evidence necessarily is prejudicial to the defendant[,] otherwise it would not have such great probative value[,]" and finding that Rule 403 requires exclusion only where the prejudicial effect is found to be undue).

In this case, any unfair prejudice from Brown's statements could only have come from the jury's improper consideration of the impeachment evidence as substantive evidence. As discussed *supra*, however, the trial court preceded the admission of the statements with an effective limiting instruction. Furthermore, although Defendant objected to the introduction of the statements, Defendant did not object to the instruction itself. Because the law presumes that the jury properly considered the statements only for their effect on Brown's credibility, any prejudice to Defendant's case cannot be deemed unfair. *See State v. Miller*, 197 N.C. App. 78, 93, 676 S.E.2d 546, 555 (stating that our Courts presume that jurors attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them), *disc. rev. denied*, 363 N.C. 586, 683 S.E.2d 216 (2009). Therefore, the trial court did not err in admitting Brown's statements under Rule 403. Defendant's argument is overruled.

Defendant received a fair trial, free of error.

NO ERROR.

Judges STEELMAN and HUNTER, JR. concur.